## STAHL PETROLEUM CORPORATION v. PEPPERS GASOLINE CO.

No. 32436. Jan. 21, 1947.

Rehearing Denied Feb. 11, 1947.

*176 P. 2d 988.*

Hall & Cotton and S. P. Render, both of Oklahoma City, for plaintiff in error.

Russell B. McCabe, of Oklahoma City, for defendant in error.

GIBSON, J. On January 8, 1938, plaintiff, owner and operator of oil and gas leases on divers tracts of land, entered into a casinghead gas contract with defendant, owner of a gasoline plant, whereby there was sold and delivered to defendant the gas produced from oil wells on plaintiff's leases.

The second amended petition of plaintiff contains two causes of action, one involving casinghead delivered from one of the leases and the other involving casinghead delivered from another. The legal questions presented on the two causes are the same.

Defendant interposed demurrers to each cause of action upon grounds that the petition did not state facts sufficient to constitute a cause of action and that the action was barred by the statute of limitation.

The court sustained the demurrers on both grounds, and plaintiff electing to stand on the petition without amendment, it was adjudged and ordered that plaintiff's petition be dismissed without prejudice, and therefrom this appeal is prosecuted.

The issue involved turns upon a construction of the contract, the material

provisions of which, omitting names of parties and description of lands, are as follows:

"Witnesseth: Whereas, Seller owns and holds a certain valid and subsisting oil and gas mining lease covering the following described lands situate and being within the County of Oklahoma, State of Oklahoma, to wit:

". . .

"and,

"Whereas, Seller is operating the above described properties and certain wells on said lands are productive, or may be productive, in addition to oil, of what is termed casinghead gas, (it being understood that the term 'casinghead gas' means the gas issuing from oil wells whether produced from the same sand or strata from which the oil is produced or by the induction of gas with compressors or other means for flowing the oil), and the Seller desires to sell the casinghead gas which may hereafter be produced from oil wells located on said premises; and,

"Whereas, Buyer contemplates the construction of, or has in operation, a gasoline plant in the vicinity of said property and desires to buy said casinghead gas;

"Now, therefore, in consideration of the sum of One ($1.00) Dollar paid by the Buyer to the Seller, receipt of which is hereby acknowledged, and other payments and covenants hereinafter specified, the Seller hereby grants, bargains, sells and agrees to deliver to the Buyer and the Buyer agrees to purchase and take from the Seller, subject to the stipulations and conditions hereinafter specified, all the casinghead gas now or hereafter produced from the wells on the lands hereinabove described.

"1—Purpose—The gas hereby sold is conveyed to the Buyer for the purpose of manufacturing therefrom gasoline or such other product or products as may be manufactured at Buyer's plant.

". . .

"5—Residue Gas—The Buyer shall return to the nearest boundary line of the Seller's lease, above described, sufficient residue gas for the development and operation of said lease, the amount of such gas not to exceed that remaining from the quantity of casinghead gas delivered to the Buyer from said lease after the extraction of gasoline therefrom, less the proportionate part of said residue gas necessary for gasoline plant operation, both determined by the residue gas curve attached hereto; provided that in the event residue gas to be returned hereunder by the Buyer shall be insufficient in quantity for the purpose of developing and operating said lease, the Seller hereby reserves the right to use casinghead gas from its lease sufficient in quantity to make up the deficiency. Utilization of said residue gas so returned by the Buyer shall be at the Seller's risk. In the event Seller accepts and uses dry gas, furnished by Buyer, in excess of the amount of residue gas to which Seller is entitled, Seller shall pay Buyer for such dry gas at delivered cost to Buyer.

"It is agreed and understood by and between the parties hereto, that if and when the residue gas remaining after the extraction of gasoline from such casinghead gas shall be more than sufficient for the needs of Buyer in the operation of said gasoline plant and more than sufficient for the needs and requirements of Seller for the development and operating purposes upon the premises from which the said casinghead gas is produced, then, and in that event, the Buyer shall have the right to sell any or all surplus residue gas so remaining; provided that in the event of sale by the Buyer of any or all of such residue gas, Buyer shall pay to the Seller herein fifty per cent of the net proceeds received from the sale of such gas, such payments to be made at the same time as other payments hereunder. Net proceeds as herein used is defined as the gross proceeds less any cost of boosting and/or transportation necessary to market such gas. It is further agreed and understood that as a basis of settlement hereunder for the sale of residue gas, it shall be determined how much residue gas the Seller was entitled to have returned and the volume that actually was returned during the month for which settlement is to be made, and the difference shall be regarded as the volume of surplus residue gas available for sale from the casinghead gas delivered hereunder. The volume of surplus

residue gas sold from the casinghead gas delivered hereunder shall be determined by the proportion which the volume of surplus residue gas available for sale from said delivery bears to the total volume of surplus residue gas available for sale from all casinghead gas delivered to said plant. . . .

"8—Settlement Tests—The gasoline content shall be determined by a field compression test made in accordance with the official code of the Natural Gasoline Association of America for testing natural gas for gasoline content. The specific gravity shall be determined in accordance with the specifications and test procedure of said association for the determination of specific gravity of natural gases by the balance method. The tests for gasoline content, air content and specific gravity of the gas shall be made by the Buyer quarterly except when, in the opinion of either party, a change in the method of operations of the lease will affect materially the gasoline content and specific gravity of the gas in which event the tests shall be made at the demand of either party upon five (5) days' notice to the other party. The Buyer shall notify the Seller in writing ten (10) days previous to the quarterly tests in order that it may have a representative present to witness said tests and/or make joint tests with its own appliances. The content tests shall be computed on the basis of four (4) ounces above an assumed atmospheric pressure of 14.4 pounds per square inch absolute and at a base temperature of sixty (60) degrees Fahrenheit."

Section 9 of the contract provides for meters to measure the casinghead delivered, the atmospheric pressure and temperature under which operated, with provision for correction of any inaccuracies that are open at all times for seller's inspection and the charts subject to call of seller for checking.

Section 10 begins as follows:

"10—Price—The Buyer shall pay to Seller for the casinghead gas delivered hereunder a price per thousand cubic feet to be computed on the following basis:"

and after providing a table wherein the price per M feet is to be paid on basis of a sliding scale depending on variations in gasoline content and in existing average price for gasoline, it further provides as follows:

"The value of the gasoline contained in a thousand cubic feet of gas shall be determined by multiplying the gasoline content (determined as hereinabove provided) by average price as quoted in the National Petroleum News for grade 26-70 natural gasoline."

Section 11 is as follows:

"11—Payment—Payment shall be made by the Buyer not later than the 20th day of each month for all casinghead gas purchased hereunder during the preceding month, and at the time payment is made a statement showing full details of the accounts shall be transmitted to the Seller accompanying the Buyer's check in payment therefor. Examination by the Seller of the books of account kept by the Buyer respecting said gas account shall be permitted by the Buyer at any and all reasonable hours."

Attached to the contract and made a part thereof by reference is a plat and table compiled by Natural Gas Association of America whereby the volume of the residue gas remaining after extraction of the gasoline is computed on the basis of the gasoline content reflected by the field tests.

Plaintiff's action is for an accounting in equity as to both the gasoline and the residue gas produced at defendant's plant.

The substance of the allegations concerning the gasoline output is reflected in the following, quoted from plaintiff's petition:

"Plaintiff further alleges that defendant has not paid to plaintiff the full amount due to plaintiff from the proceeds of gasoline produced by defendant from said casinghead gas far in excess of the amount for which defendant has paid plaintiff, and that plaintiff is entitled to full setlement and payment by defendant based upon the total amount of gasoline produced by defendant from plaintiff's casinghead gas.

"That defendant wrongfully used the 'field test' mentioned in said contract as a basis for computing the actual quantity of gasoline recovered from said casinghead gas, and the actual quantity of gasoline for which plaintiff was entitled to be paid under said contract, and fraudulently concealed from plaintiff the fact that defendant was recovering from said casinghead gas an amount of gasoline far in excess of the amount shown by the field test, and far in excess of the amount of gasoline for which defendant was paying the plaintiff."

As to the residue gas it was stated:

"8. Plaintiff further alleges that after the gasoline was extracted from said casinghead gas, there remained and was left certain residue dry gas, which, under the terms of said contract, was in the possession and under the control of the defendant, no part of which was ever returned to plaintiff or to plaintiff's lease for any purposes, and which, under the terms of said contract, defendant had the right to retain and sell, and had the duty to account to plaintiff therefor, and to pay to plaintiff fifty per cent of the net proceeds of such sales."

And after alleging there was at all times an established market price for such gas, it was further alleged:

". . . that plaintiff does not know, and therefore cannot allege, in what manner the defendant disposed of said residue gas; but plaintiff does allege that defendant either sold this said residue gas to itself or to other purchasers, or negligently and fraudulently failed to sell the same, and allowed it to go to waste, although at said times there was a market therefor; that it was defendant's duty to account for and pay to plaintiff fifty per cent of the net sales price of said residue gas, or to account for and pay to plaintiff fifty per cent of the market price of said residue gas which defendant negligently and fraudulently failed and refused to sell."

It was also alleged that the production and sales records of the gasoline manufactured and residue gas recovered are all in possession of defendant, the contents thereof unknown to plaintiff who is without remedy except by an accounting to be had.

The obligation of the defendant under the contract is thus treated as twofold, one to pay a cash consideration based upon the gasoline content and the other with reference to the residue gas.

There is no allegation in the petition that defendant failed to pay the amount owing on account of the gasoline content computed on the basis of the field tests. Hence, the sole basis of the alleged liability upon this phase must be found, if at all, in a duty of defendant to pay on the basis of the quantity of gasoline actually obtained through the reduction process.

In support of the contention that defendant was liable to so account to the plaintiff there are cited Coyle v. Louisiana Gas & Fuel Co. 175 La. 990, 144 So. 737, and Barnhill et ux. v. Rubin et al., 46 Fed. Supp. 963.

The Coyle Case is not in point nor helpful. Therein the lessee sold to its subsidiary the output of a gas well that was too rich in gasoline for domestic consumption, and received in consideration therefor a flat rate per thousand cubic feet of the gas delivered and one-third of the gasoline extracted. The lessor, who was not a party to nor consented to the sale, sued the lessee for a royalty of one-eighth of the gas on a higher flat rate per thousand cubic feet and one-eighth of the total gasoline extracted. The court held that the royalty of the lessor was to be computed on the basis of the yield to the lessee under the contract.

The only question there concerning the contract was whether it was fair and reasonable, and then only because it affected rights of the lessor who was not a party thereto. In the instant case the parties litigant executed the contract and are bound by its terms. The question here is not the wisdom or fairness of the contract but the meaning of its provisions.

The Barnhill Case is in point. There-

in was involved a contract similar in terms to that in the instant case and the action was prosecuted by both lessor and lessee for an accounting for gasoline extracted in excess of the content shown by the field tests.

It does not appear that the cited case, decided by District Court of Northern District of Texas, was ever appealed or that the holding has been specifically discussed by an appellate Federal court. However, the logic of the opinion is impaired by the holding on appeal from the same court in the case of Shamrock Oil & Gas Corporation v. Coffee et al., 140 Fed. 2d 409. And the entire force of the opinion is overturned by the holding in Saulsbury Oil Co. v. Phillips Petroleum Co. et al., 142 Fed. 2d 27 (certiorari denied by the United States Supreme Court). Therein was involved a contract similar to that we have here, and therein was applied a construction of the contract which we think is sound and applicable here and determinative of the issue here involved.

With the application here of the principles announced in the last-cited case, it follows that in the instant case there are no grounds upon which plaintiff is entitled to ask an equitable accounting as to the gasoline output.

As to the residue gas, the default of defendant, if any, so far as indicated in the petition, is the failure to return it to plaintiff, the volume of which is determinable by the table which is a part of the contract, or to account to plaintiff for the proceeds thereof if it were sold. Hence the right of action of plaintiff, if any, therefor is for breach of contract, which is not sufficiently pleaded to entitle plaintiff to relief herein.

The judgment of the trial court is affirmed.

HURST, C.J., DAVISON, V.C.J., and OSBORN, BAYLESS, WELCH, CORN, and ARNOLD, JJ., concur.